**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATHY SPIES, | ) | CASE NO. 19-CV-2928 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Kathy Spies ("Plaintiff" or "Spies"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On  March 28, 2017, Spies filed an application for SSI alleging a disability onset date of February 16, 2017,[2] and claiming she was disabled due to heart condition, diabetes (type 2), high blood pressure, cholesterol, allergies, neuropathy, and depression.  (Transcript ("Tr.") at 138-39.)  The application was denied initially and upon reconsideration, and Spies requested a hearing before an administrative law judge ("ALJ").  (Tr. 137, 165, 186.)

On November 8, 2018, an ALJ held a hearing, during which Spies, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 86.)  On February 21, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 12.)  The ALJ's decision became final on October 22, 2019, when the Appeals Council declined further review.  (Tr. 1-3.)

On December 19, 2019, Spies filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13.)  Spies asserts the following assignments of error:

> (1)  Whether the ALJ erred when he found the claimant had not developed any new severe impairments.
>
> (2)  Whether the decision erred when it rejected the medical opinion of the claimant's treating physician.
>
> (3)  Whether the decision erred when it found that the claimant's use of a cane was not medically necessary.

------

[2]  There was a prior application in this case, and the prior ALJ's decision in that case became final on February 15, 2017, when the Appeals Council declined to review that. In its denial of review of the prior ALJ's decision, the Appeals Council advised Spies that she could use the date that she requested review - January 19, 2016 - as the protective filing date should she re-apply for disability benefits.  Spies did reapply, and, following the order of the Appeals Council, the ALJ considering the current application recognized January 19, 2016, as its protective filing date.  (Tr. 15.)

2

(Doc. No. 1 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Spies was born in December 1973 and was 44 years-old at the time of her administrative hearing, making her a "younger" individual under social security regulations at all relevant times. (Tr. 36, 93.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a limited education and is able to communicate in English.  (*Id.*)  She has past relevant work as a babysitter and a routing clerk.  (*Id.* at 36.)

### B.    Relevant Medical Evidence[3]

### 1.    Mental Impairments

On August 2, 2016, Spies told certified psychiatric nurse practitioner Sharon Roesner that she and her daughters took a Greyhound bus to Florida for her aunt's funeral because her doctor said she could not fly, but she would "never again" take the bus.  (*Id.* at 291.)  A mental status exam showed her to have a well-groomed appearance, sustained concentration, a euthymic mood, a logical, organized thought process, "full" affect, and "fair" judgment and insight.  (*Id.* at 292.)  She did not report pain.  (*Id.*)

On May 31, 2017, Spies was evaluated by consultative examiner, Katherine Alouani, Psy.D., in the course of her application for disability benefits.  (Tr. 664.)  Her daughter accompanied her to the appointment.  (*Id.*)  Spies reported symptoms of depression, crying spells, fatigue, irritability, social withdrawl and social anxiety.  (*Id.* at 666, 667.)  Spies told Dr. Alouani that she

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

feared going outside because she felt people staring at her and talked about her, and on a few occasions, she experienced auditory hallucinations of voices arguing with her, making fun of her, or calling her names.  (*Id*. at 667.)  She reported needing help with all activities of daily living due to her difficulty with standing.  (*Id*.)  Dr. Alouani diagnosed Spies with "major depressive disorder with psychotic features" and social anxiety disorder.  (*Id*. at 668). She noted that Spies' insight and judgement were "fair, but significantly impacted by her anxiety," and rated her cognitive abilities as "low average to below average." (*Id*.)  Dr. Alouani opined that Spies would be only able to perform simple work related tasks, and even then, she believed that "her social anxiety appears to impact her ability to respond to pressures with other people significantly."  (*Id*. at 670.)

On June 29, 2017, Spies saw Sheerli Ratner, Ph.D., for therapy and reported having no pain that day, but was still having pain, and she hadn't been sleeping well. (*Id*. at 780). She had a depressed mood, but normal attention, concentration, and memory. (*Id*.)  Spies' daughter was expecting and she was "grateful that she has a baby coming along to take care of." (*Id*.)

On September 18, 2018, Nurse Roesner evaluated Spies' mental capacity. (*Id*. at 1743.) She opined all aspects of Spies' capacity for understanding, remembering, and applying information, as well as her ability to interacting with others were impaired to an "extreme" or "marked" degree. (*Id*. at  1742.) Nurse Roesner opined that Spies was extremely impaired with respect to her ability to follow instructions and carry out one to two step tasks, use reason and judgement to make work related decisions, handle conflict with others, and to understand and respond to social cues.  (*Id*.) Nurse Roesner also opined that Spies was markedly or extremely impaired in her ability to concentrate, persist and maintain pace, and adapt or manage herself. (*Id*. at 1743.)  Nurse Roesner found extreme limitations in Spies' capacity for working at an appropriate and consistent pace,

4

completing tasks in a timely manner, ignoring or avoiding distractions while working, sustaining an ordinary routine and workplace attendance, and in distinguishing between acceptable and unacceptable work performance.  (*Id*.)  The assessment attributed these limitations to Spies' major depressive and generalized anxiety disorders, noting Spies reported that she was afraid to leave her home because of stroke symptoms. (*Id*.)

> 2.      **Physical Impairments**

On April 13, 2016, Spies saw physical therapist Barbra Tingley, reporting that her shoe got caught on a nail in the floor and she fell onto her knee.  (*Id*. at 381-83.)  A knee immobilizer was helping her walk by reducing the pain. (*Id*. at 381.)  She was able to drive independently, but had difficulty putting on her shoes and dressing.  (*Id*. at 382.)  She stated that she had been using a cane even before she fell "due to neuropathy in both feet," but Tingley observed that she "enter[ed] PT ambulating independently without device." (*Id*. at  381.)  However, during the functional testing, Tingley assessed her as "independent with straight cane."  (*Id*. at 382.)

On May 24, 2016, Spies returned to therapist Tingley, because she had fallen and suffered an acute patellar dislocation of her left knee.  (*Id*. at 572, 577.)  Tingley noted Spies "enter[ed] PT ambulating independently with knee immobilizer on [left lower extremety]."  (*Id*. at 572-73.) During the functional testing, Tingley assessed her as "independent without device wearing L knee immobilizer."  (*Id*. at 573.)

On July 11, 2016, Spies was seen at Metrohealth's General Surgery Department for an incision and drainage of a painful abscess in her right shoulder that had not responded to antibacterial treatments.  (*Id*. at 516, 517.)

5

On April 7, 2017, Ms. Spies was seen by Dr. Fnu Rajesh for treatment of chest pains and shortness of breath that had persisted on and off for several months, bilateral knee pain, and neuropathy.  (*Id*. at 542.)

On May 8, 2017, Spies saw cardiologist Dr. Ashish Aneja for treatment of her chest pains. (*Id*. at 639.) He had previously treated her in December of 2015.  (*Id*.)  Dr. Aneja described her condition as "chronic angina which as worsened-likely significant role of microvascular disease compounded by small caliber and diffusely diseased epicardial coronaries." (*Id*. at 644.)

On April 27, 2017, Spies received a physical therapy assessment at Allied Health.  (*Id*. at 367-70.)  The physical therapist described Spies as presenting with "impaired gait status, impaired balance, absent sensation to light touch to lower legs and feet" and "global weakness" in her lower extremities.  (*Id*. at 369.)  Her gait was described as "independent with straight cane, slow."  (*Id*.) She came to the assessment wearing flip flops, and the therapist recommended closed-toe shoes. (*Id*. at 370.)

 On May 2, 2017, Spies was seen at the Allied Health physical therapy clinic for treatment of her knees.  (*Id*. at 361.)  Spies rated her pain as a "7/10," and reported that in addition to her knees, she experienced pain in her lower back, top of the buttocks, and down her legs.  (*Id*. at 361.) On examination, her muscles were tender to palpation, legs to shake in a static stance, and her gait to be slow and belabored.  (*Id*. at 362.)  Her flexibility and range of motion were restricted, and her quadriceps and achillea reflexes impaired.  (*Id*.)  Spies attended the appointment with a cane, and wearing flip flops. (*Id*. at 361.)  The therapist described her gait as "independent with straight cane, slow."  (*Id*. at 362.)

6

On June 20, 2017, Spies participated in physical therapy after a prolonged absence, and reported pain at 0/10, though she was experiencing numbness and tingling in her lower extremities. (*Id*. at 672-73, 675.)  She arrived at her appointment wearing tennis shoes and using a cane, and her gait was described as "independent with a straight cane, slow."  (*Id*. at 673-75.)

On January 3, 2018, Spies saw family practitioner Dr. Rajesh for pain and swelling in her face. (*Id*. at 872.)  She said she was taking care of her 5-month-old grandson. (*Id*.)  He believed the swelling was related to a dental issue, and suggested she follow up with a dentist.  (*Id*. at 873.)

On February 12, 2018, Spies returned to Dr. Rajesh for treatment of blood sugars which were so elevated that she lost consciousness, prompting her husband to call EMS, although she was not taken to the hospital because she "had come to once the insulin kicked in."  (*Id*. at 893.)  Dr. Rajesh adjusted her medications.  (*Id*. at 899.)

On March 24, 2018, Spies was seen at MetroHealth's Emergency Room for a headache, fatigue, and dizziness that had persisted for three days.  (*Id*. at 917.)  In the days leading up to Spies' admission at MetroHealth, her condition had worsened to include symptoms of slurred speech, nausea, and vomiting.  (*Id*. at 917, 924.) Her daughter brought her to the Emergency Departent because she was not able to express herself or move herself.  (*Id*. at 923.)   The symptoms persisted during triage, including "quite intractable vomiting" alongside intermittent sleepiness.  (*Id*. at 924.)  The initial examination at the emergency room, however, did not reveal any acute infarct or intracranial process.  (*Id*. at 922.)  MRI imaging revealed a 6 mm acute infarct of the right superior cerebellum, leading her to be diagnosed with a stroke.  (*Id*. at 929, 1239.)  Spies was then held as an inpatient, with her condition being carefully monitored.  (*Id*.)  Her dizziness, weakness, and

7

fatigue slowly improved and Spies was released on March 27, 2018, with instructions to follow-up with MetroHealth's Neurology and Physical Therapy Clinics.  (*Id*. at 966-67).

On March 28, 2018, Spies received a physical therapy neurological outpatient evaluation at MetroHealth.  (*Id*. at 999.)  She was using a rollator all the time due to unsteadiness, and reported her left side was weaker than before her stroke, and she was not able to hold a glass in her left hand.  (*Id*.)  She continued to report "vertiginous symptoms," including a room spinning sensation when she changed position.  (*Id*. at 1004.)  Her long term goals included the ability to "tolerate 15 minutes unsupported standing with [upper extremity] activity such as grooming/self care," and "ambulate household distances with straight cane."  (*Id*. at 1005.)

On April 2, 2018, Spies attended her first follow-up with Dr. Elizabeth Lee.  (*Id*. at 1012.)  She reported residual weakness in her left arm and leg and "some imbalance and dizziness occasionally," but no falls and no changes to her gait.  (*Id*. at 1012-13.)  Dr. Lee noted she was independently mobile, but she had a rolling walker with her.  (*Id*. at 1017.)  There was "no slurring of speech." (*Id*.)  Her coordination was normal, and while she had "slightly less" power in her left arm and leg than in her right, she still had 5/5 power in both arms and legs. (*Id*.)  She had improved since her stroke a few days ago and was "doing well overall."  (*Id*. at 1018.)  She was deemed not to be at risk for falls.  (*Id*. at 1012.)

On May 24, 2018, Spies was seen at by MetroHealth physician Samuel Rosenberg, M.D., reporting a four month history of low back "numbness" that traveled down the posterior of her thighs.  (*Id*. at 1580.)  She was noted not to be at risk of falls.  (*Id*. at 1585.)  Dr. Rosenberg noted the pain was centered in her left hip and ordered an x-ray. (*Id*.)  X-ray were taken of her lower spine

8

and hips, which showed sclerosis of the right sacroiliac joint, mild dextroscoliosis, and degenerative changes in the lower thoracic spine.  (*Id*. at 1589.)

On May 29, 2018, Spies saw MetroHealth physician Neenu Cherian, M.D., complaining of left shoulder pain.  (*Id*. at 1615.)  On physical exam, her range of motion at all major joints was within functional limits.  (*Id*. at 1620.)

Spies attended a total of eleven physical therapy appointments from April to June of 2018.  (*Id*. at 1031, 1076, 1108.)  By April, she reported her dizziness was rare.  (*Id*. at 1031.)  By June, she was dizzy only "once in a while when she stands from bending over," and had progressed to using only a straight cane for outside walking.  (*Id*. at 1073.)  At the ninth appointment on May 23, 2018, she arrived using a straight cane and reported she was "close to doing what [she] was doing before the stroke."  (*Id*. at 1108-09.)  However, her therapist opined she would benefit from additional appointments for vestibular training, and therefore requested and scheduled additional visits.  (*Id*. at 1112.)  At the eleventh appointment on June 21, 2018, the physical therapist noted she had made good progress and no further physical therapy was indicated.  (*Id*. at 1076.)

Spies also received ten therapy visits at Metrohealth's Occupational Therapy Clinic following her March stroke to improve her activities of daily living, perceptual impairments, left-sided weakness, imbalance, and decreased endurance.  (*Id*. at 1069, 1076.) By June 21, 2018, when her need for this therapy was reassessed, she had returned to her normal daily tasks, although she continued to report fatigue in her left arm, which caused her to drop things.  (*Id*. at 1070.)  Heat and a TENS unit were effectively managing her pain.  (*Id*. at 1071.)  She was instructed in memory strategies and  discharged from occupational therapy.  (*Id*. at 1072.)

Spies' stroke also caused a "mild cognitive communicative impairment" for which she received speech and language therapy.  (*Id*. at 1090.)  Her therapist worked to improve Spies' memory, word recall and enunciation, and problem solving ability.  (Tr. 1090, 1124.)  She was discharged on June 4, 2018, after nine appointments.  (*Id*. at 1090.)  The therapy was only partially effective, as she met a very important goal relating to her ability to use the my chart app, but showed inconsistent performance in memory tasks, mental manipulation tasks and mid-level problem solving and reasoning tasks.  (*Id*. at 1091.)  The therapist noted she "has reached her outpatient therapy potential in terms of benefit and has no return to work goals."  (*Id*.)  Because she was "functioning well in her supportive home environment, cognitively," both the therapist and Spies agreed it was time to end the therapy.  (*Id*.)

On July 26, 2018, Spies' speech difficulties worsened, and she developed nausea, vomiting and a headache (*Id*. at 1176.)  Her family brought her to MetroHealth's Emergency Room.  (*Id*.)  After running a variety of tests, the treating staff diagnosed her with a "presumed" second stroke, a CT scan showed no bleeding in her head. (*Id*. at 1180.)  She was admitted for observation.  (*Id*.)

On July 29, 2018, while hospitalized, Spies received an physical therapy evaluation.  (*Id*. at 1187.)  The therapist noted she had a "[v]ery limited need/use of assistive device during mobility."[4] (*Id*. at 1188.)  She was determined to be functionally appropriate for discharge home with 24/7 family supervision and assistance.  (*Id*. at 1189.)

On August 6, 2018, Dr. Richard Wilson opined regarding her physical capacity. (*Id*. at 1250-51.)  Dr. Wilson opined that Spies has the following functional limitations:

---

[4]  Medical records indicate the assistive device used was a quad cane.  (Tr. 1188.)

- could lift five pounds frequently and ten pounds occasionally, but only with her right arm;

- could stand for three hours, and sit for six hours in a workday;

- required an accommodation to alternate between sitting and standing;

- could rarely[5] capable of reaching, pushing, and pulling;

- could occasionally[6] perform fine and gross manipulation;

- her pain would impair her ability to concentrate and to remain on task in a work setting; and

- would need to take unscheduled breaks "at will."

(*Id*.)  Dr. Wilson noted that Spies had been prescribed both a cane and a walker.  (*Id*. at 1251.)

On August 10, 2018, Spies was evaluated for occupation therapy.  (*Id*. at 1750.)  The therapist noted she came to the appointment ambulating with a straight cane.  (*Id*. at 1752.)  The therapist determined therapy was appropriate, with goals including "manipulating clothing fasteners with modified independence," "tolerat[ing] 45 minutes of moderate activity," and "modified independence" in showering, bathing, preparing hot meals, and cleaning up."  (*Id*. at 1756.)  At her last documented therapy appointment, on September 6, 2018, Spies had not met these goals.  (*Id*. at 2074.)

At an August 14, 2018, occupational therapy appointment, Spies continued to exhibit deficits with visual scanning, impaired depth perception, and ongoing headache.  (*Id*. at 1761-63.)

---

[5] The form defined "rare" as meaning the activity "cannot be performed for any appreciable period of time."  (Tr. 1250.)

[6] The form defined "occasional" as meaning "from very little up to 1/3 of the workday.  (Tr. 1250.)

11

On August 22, 2018, Spies was assessed for outpatient physical therapy.  (*Id*. at 1787.)  She reported using a straight cane for walking distances, but not in her small apartment.  (*Id*.)  The therapist noted a "slight decline in function" since her prior therapy ended, but noted her "slight decline in balance scores" meant that she was now a "borderline risk for falls."  (*Id*. at 1792.)

On August 25, 2018, Spies experienced right-sided facial droop and swelling caused by a subcutaneous abscess, and was admitted to the hospital. (*Id*. at 1925.)  The medical team determined this infection was the result of a retained dental root after the recent extraction of two incisors.  (*Id*. at 2058.)  After additional dental surgery, performed on August 27, 2018, Spies infection resolved. (*Id*.)

On August 28, 2018, Spies was discharged from the hospital.  Discharging physician Molly Marunowski, D.O. described Spies as ambulatory, with no activity restrictions. (*Id*. at 1815.)

## C.      State Agency Reports

### 1.      Mental Impairments

On June 7, 2017, state agency reviewing psychiatrist Aracelis Rivera, Psy.D., reviewed the record and opined that Spies had no more than moderate limitations in her mental functional capacity.  (*Id*. at 145-47.)

On August 8, 2017, state agency reviewing psychiatrist Tonnie Hoyle, Psy.D., reviewed the records and opined that Spies had the following mental limitations:

- perform simple tasks with simple, short instructions;

- make simple decisions;

- have few workplace changes;

- no fast-paced production quota environments; and

12

- limited to superficial interaction with coworkers, supervisors and the public.

(*Id*. at 160-62.)  Dr. Hoyle explained that "superficial" referred to "the intensity of the interactions so no negotiations or confrontations."  (*Id*. at 162.)

### 2. Physical Impairments

On May 18, 2017, state agency reviewing physician Linda Hall, M.D. evaluated Spies' functional capacity by reviewing her medical records.  (*Id*. at 145, 164.)  Dr. Hall opined that Spies functioning had not changed since her first disability hearing, and therefore adopted the Residual Functional Capacity ("RFC") determination of the prior ALJ, which contained the following limitations:

- lift 20 pounds occasionally and 10 pounds frequently;

- stand and walk for six hours out of an eight hours;

- limited to "frequent" handling, finger, and feelings with her upper extremities;

- unable to work in jobs that required exposure to hazards and pulmonary irritants.

(*Id*.)  On August 16, 2017, state agency reviewing physician Anton Freihofner, M.D., reviewed the record and concurred with Dr. Hall and the prior ALJ.  (*Id*. at 158-60.)

### D. Hearing Testimony

During the November 8, 2018 hearing, Spies testified to the following:

- She recently had both occupational and speech therapy at MetroHealth.  (Tr. 93.)

- Her speech therapy is ongoing, with four more sessions.  Her fluency has improved. (*Id*. at 94.)

- She uses a cane when she goes out, but not usually at home because her house is small enough that she can hold onto furniture.  (*Id*.)

- She goes out of the house for medical appointments, to visit her mother, and shops about three or four times a month.  (*Id*. at 94-95.)

13

- The physical and occupational therapy addressed problems with her arm and legs. She had problems with her arm before her stroke. (*Id*. at 96.)

- She has a hard time remembering things, and can't remember how many strokes she has had. (*Id*. at 97.)

- Her daughter reminds her to take her medication. (*Id*. at 98.)

- She can't remember the names of her high school classmates. (*Id*.)

- She lives with her 19 year old daughter, who also helps with her laundry and cooking. (*Id*.)

- She has a hard time keeping her balance when carrying stuff, and fell about five times in the past year, mostly at home, but once outside when she tripped over a curb. (*Id*. at 99.)

- Her memory is worse now than it was after her stroke in March. (*Id*. at 100.)

- She can stand for only about five minutes at a time. She can walk for about ten minutes before she needs to take a break. (*Id*. at 101.)

- Her daughter does the grocery shopping. She tries to help with chores, but has problems holding heavy things with her left arm. She drops things three or four times a week. (*Id*. at 102.)

- She regularly lifts a gallon of milk with her right hand, but the heaviest thing she regularly lifts with her left hand is a drinking glass. (*Id*. at 103.)

- She completed the ninth grade, and never earned a GED. (*Id*. at 107.)

The VE testified Spies had past work as a faucet assembler, waitress and a babysitter. (*Id*. at 108.) The ALJ then posed the following hypothetical question:

For this hypothetical, I'm going to ask you to assume the past work as a routing clerk . . . . [T]his hypothetical individual is a younger individual, having been born December **, 1973.

And was 43 years old on the alleged onset date of February 16, 2017. For this first hypothetical, please assume that the individual is limited to work at the sedentary exertional level. Lifting and carrying is limited to 10 pounds occasionally, and less than that frequently.

14

That person can stand or walk for two hours out of an eight hour workday. That person can only occasionally climb ramps and stairs.

And cannot climb ladders, ropes or scaffolds. That person can frequently balance and occasionally stoop, kneel, crouch and crawl. And actually I'm going to change that to occasionally balance. . . . the individual can occasionally handle, finger and feel. That person cannot work . . . with the left non-dominant upper extremity. That person cannot work with hazards such as unprotected heights or moving machinery.

That person should not perform commercial driving. That person must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, gases and poor ventilation. That person must avoid concentrated exposure to extreme temperatures or humidity. That person can perform simple, routine tasks with simple, short instructions. That person can make simple decisions in an environment where there are few workplace changes. In other words in a static and routine environment.

And again no fast paced production quotas. The person is limited to brief and occasional superficial interaction with co-workers or supervisors or the general public, in a non-public setting.

And by superficial I define that as the interaction, the job duties cannot require arbitration, negotiation or conflict resolution, management or supervision of others, or being responsible for the health, safety or welfare of others. . . . Would that individual be able to perform any of Ms. Spies' past work, or any other work in the national economy?

(*Id*. at 110-12.)

The VE testified the hypothetical individual would not be able to perform Spies' past work.

(*Id*. at 112.) The VE further explained the hypothetical individual would also not be able to perform

other representative jobs in the economy, because the limitations on handling, fingering and feeling

precluded sedentary unskilled assembly work, and the limitations of interactions would preclude

sedentary unskilled clerical work. (*Id*.)

The ALJ asked whether changing the hypothetical to permit frequent handling, fingering and

feeling in the non-dominant upper extremity would result in the same conclusion. (*Id*. at 112-13.)

15

The VE explained that a very limited number of sorting type jobs would be available, including nut sorter. (*Id*. at 113.)

The ALJ asked the VE's opinion regarding if and when off-task behavior would interfere with a person's ability to maintain or sustain employment. (*Id*.) The VE testified that, for the type of jobs alluded to in the ALJ's hypothetical, "anything in excess of approximately 15 percent becomes job prohibitive." (*Id*. at 113-14.)

Next, the ALJ asked whether the second hypothetical would be affected by the additional requirement of needing a cane to ambulate. (*Id*. at 115.) The VE testified this would not change his answer, as the job of nut sorter, like most sedentary jobs, is primarily performed while sitting. (*Id*.)

Finally, the ALJ asked whether the second hypothetical would be affected by the additional requirement of needing reminders to stay on task once every two hours. (*Id*.) The VE testified that this would preclude competitive employment, as that type of work environment is only available in a sheltered workshop. (*Id*.)

### III.   STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the

claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant, Kathy J. Spies, was found not to be disabled in a final decision Administrative Law Judge Traci M. Hixson issued on November 24, 2015.

2.     The request for hearing the claimant filed on September 29, 2017 is dismissed under *res judicata* principles codified at 20 CFR 416.1457(c)(1) in so far as it is alleged the claimant was disabled at any time prior to November 25, 2015.

3.     The claimant has not engaged in substantial gainful activity since November 25, 2015.

4.     The claimant has the following severe impairments: coronary artery disease, hypertension, diabetes mellitus, diabetic neuropathy, asthma/chronic

17

obstructive pulmonary disease, bilateral carpal tunnel syndrome, obstructive sleep apnea, affective disorders, and a generalized anxiety disorder.

5.    The claimant has not had an impairment or combination of impairments since November 24, 2015 that has met or medically equaled the severity of one the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

6.    Since November 25, 2015, the claimant has retained the same residual functional capacity Judge Hixson determined she had in the above-mentioned unfavorable decision he issued on November 24, 2015. More specifically, she can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally. She can also sit, stand, and walk for six hours each in an eight-hour period. She can also occasionally climb ramps or stairs but she cannot climb ladder (sic), ropes, or scaffolds. She can also frequently balance, and she can occasionally stoop, kneel, crouch, and crawl. She can also reach in all directions and she can frequently handle, finger, and feel objects. She cannot work around hazards such as unprotected heights or moving machinery. She also cannot work in jobs where she would have concentrated exposure to pulmonary irritants such as fumes, dust, and gases. She also has not been able to work in jobs where she would be exposed to extreme temperatures or humidity. Mentally, the claimant can perform simple, routine tasks and make simple decisions in jobs with simple, short instructions and few workplace changes. However, she cannot perform work involving fast-paced production quotas. The claimant has been further limited to work involving no more than superficial interactions with coworkers, supervisors, and members of the public. Superficial refers to the intensity of the interactions so no negotiations or confrontations.

7.    The claimant has not been able to perform any of her past relevant work since November 25, 2015.

8.    The now 45-year-old claimant has been considered to be a younger individual in the "18 to 49" age group ever since November 25, 2015.

9.    The claimant, who has a limited education, is able to communicate in English.

10.    Transferability of job skills is not an issue in this case because the claimant has been limited since November 25, 2015 to work involving simple routine tasks.

11.    Having considered the claimant's age, education, work experience, and residual functional capacity, the undersigned concludes that there are a

18

significant number of the jobs in the economy that the claimant has been able to perform since November 25, 2015.

12.     The claimant, Kathy J. Spies, has not been under a disability, as defined in the Social Security Act, at any time between November 25, 2015 and the date of this decision.

(Tr. 18-38) (internal citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

20

# VI.  ANALYSIS

**A.      The Analysis of Stroke as a Severe Impairment**

First, Spies asserts that the ALJ erred by finding that she did not have any new severe impairments since the decision in her prior application, and failing to recognize her two stokes and bilateral knee disorder as new severe impairments.  (Doc. No. 11 at 14.)  She argues that both conditions qualified as severe impairments, and recognizing these new impairments as severe would have necessitated the ALJ's adoption of a new, modified finding of RFC.  (*Id*.)  She also asserts that the ALJ failed to address Spies post-stroke medical records, instead "selectively parsing the record" to focus on the pre-stroke period.  (*Id*. at 16.)

The Commissioner asserts that the ALJ made a through, detailed analysis at Step Two, and articulated good reasons for his determination that Spies' strokes and patellofemoral knee disorders were not a severe impairment.  (Doc. No. 13 at 4-5.)  Further, he argues that even if the ALJ erred in this determination, it was not reversible error, because he found other severe impairments and properly proceeded through the sequential analysis, considering both severe and non-severe impairments in the following steps. (*Id*.)  Finally, he notes that Spies does not dispute that the pre-stroke records cited by the ALJ established that there was no significant change in her functioning prior to the stroke, implicitly conceding that she was not disabled prior to March 2018, when she had her first stroke.  (*Id*. at 6, n.3.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a)(40)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20

C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at *5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96 3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96 8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id.*

22

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at *2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is . . .legally irrelevant." *Anthony v. Astrue*, 2008 WL 508008 at *5.

Here, at Step Two, the ALJ found that Spies had severe impairments of coronary artery disease, hypertension, diabetes mellitus, diabetic neuropathy, asthma/chronic obstructive pulmonary disease, bilateral carpal tunnel syndrome, obstructive sleep apnea, affective disorders, and a generalized anxiety disorder.  (Tr. 18.)  He explained his determination that Spies' strokes and patellofemoral disease were not severe as follows:

> The claimant also had a cerebrovascular accident on March 24, 2018, and a possible second stroke in July 2018.  However, the undersigned does not expect that these event have caused the claimant to have any work-related limitations separate from the limitations caused by her severe impairments.  In addition, the undersigned is not persuaded that the stroke the claimant had on March 24, 2018, by itself or in combination with the possible second stroke she had in July 2018, will interfere with her ability to perform a work-related activity for any continuous 12-month period.  Therefore, the undersigned does not find that either the cerebrovascular accident the claimant had on March 24, 2018, or the possible second stroke she had in July 2018, qualify as severe impairments. Notwithstanding this determination, the undersigned has considered the stroke the claimant had on March 24, 2018, and the possible stroke she had in July 2018, in assessing the residual functional capacity she has had since November 25, 2015 (see the discussion below beneath Finding 6).

> The claimant also alleged that she has suffered at different times since November 25, 2015 from . . . knee pain.  The evidence also shows the claimant has received palliative care for her subjective pain complaints including physical therapy.  However, the undersigned has given no weight to these complaints because there is no radiological evidence in this case of a knee impairment.

(*Id*. at 19) (internal citations omitted).

In his Step Two analysis of Spies' strokes, the ALJ combined the severity requirement of Step Two with the durational requirement. The first two steps of the five-step test for determining disability "involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work." *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 889, 107 L.Ed.2d 967 (1990). 20 C.F.R. § 404.1520(a)(4)(ii) provides in relevant part that the second step of the five-step evaluation involves consideration of "the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled." 20 C.F.R. § 404.1520(a)(4)(ii). The duration requirement regulation states that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.   The Plaintiff bears the burden of proving the existence of a medically determinable impairment that meets the twelve-month durational requirement. *Jones*, 336 F.3d at 474.  The ALJ also noted that "the undersigned does not expect that these event have caused the claimant to have any work-related limitations separate from the limitations caused by her severe impairments." (Tr. 19.)

The "Finding 6" analysis that the ALJ references includes evidentiary findings from throughout the relevant period, including citations to numerous records predating Spies' initial

24

stroke.   However, he also cites at least 14 records from the period of March through October 2018.  (*Id*. at 32.)  These record show that nine days after her initial stroke, she had recovered fill strength in her arms and legs, and "grossly normal" coordination.  (*Id*.)  Almost exactly two months after that stroke, on May 23, 2018, she reported that she was "doing pretty good" and was "close to doing what [she] was doing before the stroke around the house."  (*Id*.)  The following day, her physical therapist noted she was "able to tolerate standing for the entire session."  (*Id*. citing Tr. 1284.)  On August 28, 2018, a doctor preparing to discharge Spies from the hospital following a facial infection described Spies as ambulatory, with no activity restrictions. (*Id*., citing Tr. 1815.)

The ALJ also throughly considered evidence regarding Spies' mental functional capacity following the stroke, and relied heavily on her ability to interact with the hearing participants; understand, remember, and apply information; and concentrate and maintain attention in that context.  (*Id*. at 34.)

The Court finds substantial evidence supports the ALJ's determination that Spies failed to satisfy her burden to establish that her strokes met the twelve-month duration requirement.  It is undisputed that the strokes significantly impaired her functioning for a short time, but the ALJ identifies substantial evidence that Spies recovered to levels that were at or near her prior functioning.  There is also evidence in the record that could support the opposite conclusion, but it is not this Court's role to re-weigh the totality of the evidence.  Because substantial evidence regarding Spies' recovery supports a finding that Spies did not show her stroke caused disabling symptoms that "continued unabated for at least 12 months" from the time of her initial March 24, 2018 stroke, the Court must uphold the ALJ's decision.  *Lyons v. Soc. Sec. Admin*., 19 F. App'x 294, 300 (6th Cir. 2001).

Similarly, the record is mixed regarding Spies' patellofemoral disease.  Although Spies asserts that "[t]he record shows that Ms. Spies' knee issues have caused numerous falls and sprains," the documents she cites attribute these generally to "chronic numbness of lower legs and feet, and chronic pain to lower back, bilatereral lateral hips, and bilateral knees," "chronic pain in both knees," and a knee sprain or dislocation caused by a fall.  (Doc. No. 11 at 17, Tr. 369, 474, 526.) Spies did not identify patellofemoral disease as a cause for her disability in either her initial application, or her request for reconsideration.  (Tr. 138-39, 251.)  At her hearing, Spies attributed her need for a cane to her neuropathy, and the ALJ recognized this as a severe impairment.  (*Id*. at 381.)  Spies points to no evidence that distinguishes the impairment caused by patellofemoral disease from the impairment caused by her neuropathy, back pain and hip pain.  Spies' ambulation is discussed at greater length in section C,[7] below, but for the purposes of evaluating the ALJ's step two findings, the Court finds that sufficient evidence supports the ALJ's conclusion that patellofemoral disease was not a substantial impairment, and the ALJ nonetheless considered evidence of Spies' mobility and subjective pain, including the falls and sprains.

**B.    The Medical Opinion of Dr. Wilson**

Next, Spies asserts that the ALJ erred by rejected the findings contained in the medical opinion of Spies' treating physician, Dr. Wilson.  (Doc. No. 11 at 17.)  Dr. Wilson provided an assessment of Spies' residual physical functional capacity in August of 2018, approximately six months after her first stroke.  (*Id*.)  Spies asserts the ALJ erred by giving greater weight to the

---

[7]  Subsection C addresses Spies' assertion that the ALJ erred by finding her use of a cane was not medically necessary.

26

opinions of the state agency reviewing physicians, who both examined the record prior to Spies' first stroke, and therefore did not consider any stroke-related impairments in their analysis.  (*Id*. at 18.)

The Commissioner responds that the ALJ appropriately discounted Dr. Wilson's opinion because it was inconsistent with the record as a whole.  (Doc. No. 13 at 7.)  He notes that Dr. Wilson wrote his opinion less than two weeks after Spies' second stroke, and attributed the limitations in his opinion to left "sided weakness due to stroke," which may explain the severe limitations he described.  (Doc. No. 13 at 8, citing Tr. 1250.)  He also points out that Dr. Wilson did not specify whether his opinion would apply after Spies received rehabilitative therapies, nor did he specify whether the opined limitations applied to the period before Spies' first stroke.  (*Id*.)

This claim was filed the day after the expiration of the previous rules for treating source opinions, on March 28, 2017.  For claims filed after March 27, 2017, the rules set forth in 20 C.F.R. § 404.1520 apply to the evaluation of medical opinion evidence in social security claims.[8]  These regulations, which replace the rules set forth in 20 C.F.R. § 404.1527, explain that the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  20 C.F.R. § 404.1520c.  However, the new regulations state "we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."  *Id*.  The factors the agency

---

[8]  Spies formulates her argument under the prior rules, however it still merits the Court's consideration under this new regulatory framework, because the factors she cites - the length and nature of the treating relationship, and frequency of examinations, all remain relevant.

27

considers include supportability, consistency, relationship with the claimant,[9] specialization, and "other factors" including evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. *Id.* These factors are not weighed equally    the rules identify supportability and consistency as the most important factors is evaluating the persuasiveness of medical opinion evidence.  *Id.*

The ALJ addresses Dr. Wilson's Opinion as follows:

The undersigned has also considered the opinions about the claimant that M. Wilson, M.D.,[10] a treating physician, offered on August 6, 2018.   More specifically, Dr. Wilson said the claimant was not able to lift any weight with her left upper extremity because of "left-sided weakness."   Dr. Wilson also said, without explaining why, that the claimant could frequently lift and carry up to five pounds frequently [sic] and up to 10 pounds occasionally.  Dr. Wilson also said that, because of "left-sided weakness" and "chronic left shoulder pain," the claimant could not sit for more than 15 minutes at a time, or for more than six hours in and eight hour period.  Dr. Wilson also said that, because of "left-sided weakness" and an "increased risk for falls," the claimant could rarely climb, balance, stoop, crouch, kneel, or crawl.  Dr. Wilson also said that, because of "left-sided weakness," the claimant could rarely reach, push, or pull, and that she could only occasionally perform fine and gross manipulation.  Dr. Wilson also said that, because of an increased risk for falls, the claimant should not work on unprotected heights.  Dr. Wilson also said that, because "temperature extremes may affect control of the left side," the claimant should not work around temperature extremes.  Dr. Wilson also [sic] the claimant had been prescribed both a cane and a walker.  Dr. Wilson also described the claimant as suffering from "severe" pain in her legs, and that she needed to be able to alternate positions at will, and that she needed to be able to take unscheduled breaks at will.

---

[9] This includes the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and if there is an examining relationship.  20 C.F.R. § 404.1520c(c)(3).

[10]  This portion of the decision refers to the opinion provided by Dr. Richard Wilson, whose printing is difficult to decipher, and whose signature is illegible.  There is no opinion by an "M. Wilson" in the record.  Neither party describes the treating relationship between Dr. Richard Wilson and Spies, but he is listed as the referring physician for her post-stroke occupational therapy.  (*See, e.g.*, Tr. 2072.)

In giving little to no weight to Dr. Wilson's opinions, the undersigned first notes that there is no evidence that the claimant has not had,[11] and is not expected to have, significant left-sided weakness over any continuous 12-month period relevant to this decision.  The undersigned has also given little weight to his statements that both a walker and a cane had been prescribed for the claimant.  This is because there is no evidence that the claimant was prescribed a cane or a walker by Dr. Wilson.  Rather, the evidence shows that the claimant has said the cane she has used since November 25, 2015 was prescribed for her sometime prior to November 25, 2015.  The evidence concerning the claimant's motor functioning since November 25, 2015, including the evidence referenced above, also does not support a finding that it has been medically necessary for the claimant to use a cane or a walker over any continuous 12-month period relevant to this decision.  Besides not being supported by the evidence concerning the claimant's physical functioning referenced in this decision, Dr. Wilson's opinions are also at odds with the opinions of Drs. Hall and Freihofner, the above-mentioned State agency physicians who reviewed this record.

(*Id*. at 35-36) (internal citations omitted).

The Commissioner notes that Dr. Wilson provided his opinion only two weeks after Spies' second stroke.  Thus, it is entirely possible that his opinion accurately reflected Spies' condition at the time it was rendered, and yet was entitled to little weight because it did not reflect her condition over a continuous twelve month period, as the ALJ asserts.  As discussed *supra*, the ALJ found substantial evidence that Spies' physical condition improved significantly with therapy following her strokes. Further, as the ALJ noted, there is no discussion of the duration of the limitations Dr. Wilson described, and substantial evidence that the therapy Spies' received significantly improved her functioning.

Although Spies argues that length of her treatment relationship with Dr. Wilson, the frequency of examinations, and the nature and extent of the treatment relationship should all

---

[11]  The double negative appears to be an error, because the statement as written supports Dr. Wilson's opinion.  The Commissioner asserts that the ALJ is stating that there is no evidence that Spies has had left-sided weakness over a continuous twelve-month period.

influence the ALJ's decision, she does not describe the length, nature or extent of this treatment relationship, nor is it apparent from the records she cited. (Doc. No. 11 at 18.)  Instead, Spies contrasts Dr. Wilson with the state agency reviewing physicians, who indisputably never examined or treated her, and rendered their opinions prior to her strokes.  (*Id*.)  However, they did review her full medical record, to the extent it was available at the time of their review.  Thus, the ALJ could reasonably assume that they were providing an assessment of her functional abilities over the entirety of that period, whereas there is no indication that Dr. Wilson was doing more than providing a opinion of her functional abilities immediately following her second stroke.

The Sixth Circuit made clear that it is appropriate for an ALJ to give great weight to a state agency reviewer's opinion, even when contrary evidence is submitted after the opinion is issued, so long as the ALJ considers the later evidence. *McGrew v. Comm'r of Soc. Sec*., 343 F. App'x 26, 32 (6th Cir. 2009) ("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition. It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after Dr. Starkey's assessment, . . . including Dr. Goldstick's contrary assessment, and took into account any relevant changes in [Plaintiff]'s condition.").  Here, as in *McGrew*, the ALJ explicitly considered the later evidence, including a treating physician's contrary assessment, in making his assessment.

In sum, the ALJ's decision sets forth good reasons for discounting the opinion of Dr. Wilson, and this assignment of error is without merit.

**C.      Whether Use of a Cane Was Medically Necessary**

Last, Spies asserts that the ALJ erred when he failed to include Spies' need for a cane in

30

his determination of her residual functional capacity.  (Doc. No. 11 at 20.) She asserts the ALJ "fails to offer even one specific reason as to why he excluded Ms. Spies' need for a cane from her assigned residual functional capacity," whereas the medical record evidence contains "a host of evidence supporting the medical necessity of Ms. Spies' use of a cane, particularly a history of falls and instability."  (*Id.*)

The Commissioner responds that Spies failed to submit evidence that fulfills the requirement of the regulation which pertains to this issue: Social Security Ruling ("SSR") 96-9p. (Doc. No. 13 at 10.)  He argues that because the burden of showing the need for a cane was medically necessary fell on Spies, and she failed to satisfy that burden, the ALJ appropriately omitted the use of a cane from his determination of Spies RFC.  (*Id.*)

SSR 96 9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96 9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).  Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). The Sixth Circuit has not directly ruled on this issue but other courts in this district have noted that, in cases involving assistive devices including a cane, documentation

31

"describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p.  *McGill v. Comm'r of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019), *citing Carreon v. Massanari*, 51 F. App'x at 575; *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

Spies points to evidence that she had multiple falls, some requiring treatment at the ER, and one leading to dislocation of her left knee.  (Doc. No. 11 at 21.)  The Court also notes that, as discussed *supra*, Dr. Wilson stated that both a walker and a cane had been prescribed for Spies at some point prior to August 6, 2018. (Tr. 35.)  However Spies does not identify any evidence that meets the standard articulated in SSR 96-9p, which requires documentation giving context for the need for a cane by describing the circumstances for which it is needed.    In similar situations, multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for a cane in a claimant's RFC. *See, e.g., Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506 at *19 (N.D. Ohio Dec. 12, 2018) ("Moreover, as [the doctor's] confirmation of a cane prescription does not indicate 'the circumstances for which [the cane] is needed,' it does not fulfil the requirements under SSR 96-9p." ); *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356 at *6 (S.D. Ohio March 13, 2019) (finding ALJ did not err in not including a limitation for a cane where

32

physician indicated claimant would need a cane but did not describe the specific circumstances for which a cane is needed as required by SSR 96-9p); *Salem v. Colvin*, No. 14-CV-11616, 2015 WL 12732456 *4 (E.D. Mich. Aug. 3, 2015) (finding the ALJ did not err in not including a limitation for a cane, when it had been prescribed, but the prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane."); *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246 at *5 (E.D. Mich. July 21, 2017) (rejecting claimant's assertion that the ALJ failed to account for her use of a cane, stating that nothing in the physician's "mere prescription for a cane provides evidence to indicate the frequency with which the cane should be used, its purpose, or its limit upon Plaintiff's ability to perform light work" (citations omitted)). Therefore, the ALJ appropriately applied SSR 96-9p in omitting the use of a cane from his determination of RFC, and Spies' third assignment of error is without merit.[12]

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 26, 2020

---

[12] Further, even if this was an error, it would be harmless, as the VE testified that adding the limitation of use of a cane to the hypothetical provided by the ALJ would not preclude sedentary work.  (Tr. 115.)